**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JENNIFER P.,**

                                        **Plaintiff,**

        **vs.**                                                **6:18-cv-0026**
                                                                **(MAD)**

**NANCY A. BERRYHILL,**
*Acting Commissioner of Social Security,*

                                        **Defendant.**
_____

**APPEARANCES:**                      **OF COUNSEL:**

**JENNIFER P.**
Plaintiff *Pro Se*

**SOCIAL SECURITY ADMINISTRATION**        **KATHRYN S. POLLACK, ESQ.**
Office of General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

    On January 22, 2015, Plaintiff filed an application for disability insurance benefits

("DIB"), and supplemental security income ("SSI"), alleging disability beginning July 1, 2012.

*See* Administrative Record ("R.") at 18.  On March 6, 2015, Plaintiff's claim was initially denied,

and after a hearing, the claim was denied by an Administrative Law Judge ("ALJ") on March 1,

2017.  *See id.* at 32, 75.  The Social Security Administration ("SSA") Appeals Council denied

Plaintiff's request for review on November 3, 2017.  *See id.* at 1.

    Plaintiff has appealed the SSA's decision to this Court.  *See* Dkt. Nos. 1, 15.  For the

following reasons, Plaintiff's appeal is denied.

## II. BACKGROUND

**A.    Plaintiff's Medical History**

### 1. *Neck, Spine and Nerve Pain*

In August 2012, Plaintiff had an initial evaluation with physician assistant ("P.A.") Kristi Bane at Southeastern Pain Management in Alabama. *See* R. at 246-49. At that visit, Plaintiff reported that she had sharp pain, numbness, and tingling in her hands, neck, and feet that began one year prior when she fell and hit her head on concrete. *See id.* She said that her pain level was at a "9/10," her pain was relieved with Lortab, and she had received a cervical epidural steroid injection ("ESI") in the past, which "provided 4-5 months of near complete pain relief." *See id.* P.A. Bane examined Plaintiff and diagnosed her with cervical degenerative disk disease and cervical spondylosis. *Id.* Plaintiff received another cervical ESI which helped with her pain. *See id.* at 244-47.

On December 20, 2013, Plaintiff visited orthopedist Ninos Oda, M.D. at Rome Medical Practice in New York for new neck pain and tingling in her right hand, although she denied having any weakness in her hands or dropping any objects. *See id.* at 297. An MRI conducted on January 14, 2014 showed multilevel degenerative change and disc protrusions at the C4-C5 and C6-C7 levels. *See id.* at 251-53. Additionally, the MRI report noted that there was "probably little interval change in degree of hypertrophic degenerative change and intervertebral disc disease" since a prior MRI from March 2013. *See id.* On January 24, 2014, Plaintiff denied having any numbness or weakness in her hands, and Dr. Oda referred Plaintiff to a pain clinic and spinal surgeon to see if she was a good candidate for a spinal block or spinal fusion. *See id.* at 295-96.

On January 23, 2015, Plaintiff complained of neck pain at her annual physical examination with primary care provider Benjamin Sommer, D.O. and informed him that shots had "help[ed] a lot in the past." *See id.* at 378-80. Images of Plaintiff's cervical spine taken on February 9, 2015 revealed multiple degenerative changes and "slight levoconvex scoliosis of the cervical spine with straightening of cervical lordosis that could be positional or could reflect muscle spasm." *See id.* at 255. On February 13, 2015, nurse practitioner ("N.P.") Nancy Furlong at Rome Memorial Hospital noted that Plaintiff had "very limited range of motion of the head and neck" and prescribed physical therapy and anti-inflammatory medication. *See id.* at 293-94. On March 23, 2015, Plaintiff informed Dr. Sommer that steroids were "help[ing] her neck and lower back a lot." *See id.* at 338.

An MRI of Plaintiff's lumbar and cervical spine from April 2015 shows mild edema at the C4-C5 level, which was a new development since the January 2014 exam. *See id.* at 335. The images show "degenerative spondylosis [that was] slightly worse than on previous exam" and found "worsened neural foraminal narrowing." *See id.* By July 2015, Plaintiff reported joint pain to Dr. Sommer, but told him that she was "trying to get out in the garden and work a lot" and was avoiding the sun because it exacerbated her symptoms. *See id.* at 325.

In August 2015, Plaintiff visited orthopedist Rudolph Buckley, M.D. at the Hamilton Orthopaedic Surgery and Sports Medicine, who found that she had a full range of motion in her neck without pain. *See id.* at 323. Although Dr. Buckley did not observe anything abnormal about Plaintiff's spine, he reported that Plaintiff had experienced pain to palpation of the spine around C4-7 and L5. *See id.* Dr. Buckley referred Plaintiff to a chiropractor and pain management specialist, at Plaintiff's request. *See id.* at 321-24.

Plaintiff saw Dr. Sommer on September 14, 2015 and told him that she was still experiencing a lot of pain and could not lift her groceries because it hurt her neck and lower back. *See id.* at 319. Dr. Sommer prescribed pain medications and referred Plaintiff to a pain management specialist. *See id.* at 319-20. At Plaintiff's annual physical on December 21, 2015 she reported "lots of joint pain, neck and shoulders." *See id.* at 466. However, Dr. Sommer noted "[a]ll and all . . ., she is doing much better than when I first started seeing her, and seems to be getter [sic] her life in order." *See id.*

On December 23, 2015, Plaintiff visited rheumatologist Martin Morell, M.D. at Arthritis Specialists who diagnosed her with degenerative disc disease through the neck, rotator cuff impingement on the right shoulder, and fibromyalgia. *See id.* at 464-65. Dr. Morell reported that Plaintiff was "full[y] treated at this point" and there was no evidence of lupus, rheumatoid arthritis, or other rheumatic issues. *See id.*

On February 2, 2016, Plaintiff had a bone density scan which showed normal bone mineral density in her lumbar spine and very minimal early osteopenia in her left femoral neck. *See id.* at 429, 461-63. An MRI on February 20, 2016 indicated that "degenerative disc disease is present at C4-C5, C5-C6 and C6-C7," but noted that little had changed since April 2015. *See id.* at 430-31.

### 2. Abdominal Pain

Plaintiff visited the ER in August 2014, December 2014, and January 2015 for abdominal pain. *See id.* at 264-67, 273, 277, 284. On January 6, 2015, Plaintiff saw gastroenterologist Michael Rosenfeld, M.D. to treat her abdominal pain, nausea, and weight loss. *See id.* at 286-90. Plaintiff reported partial relief from taking Zofran and Omeprazole. *See id.* Sonographic images of Plaintiff's abdomen did not show any acute findings, although an upper endoscopy and biopsy

4

revealed chronic appearing gastritis in the body of her stomach. *See id.* at 254, 286-89. A CT scan of Plaintiff's abdomen and pelvis showed that Plaintiff may have mild colitis, but nothing else appeared abnormal. *See id.* at 284-85. On January 15, 2015, Dr. Rosenfeld diagnosed Plaintiff with gastritis, gastroduedenitis, and acute esophagitis. *See id.* at 306. Dr. Rosenfeld also reported that Plaintiff's motor strength was "grossly intact" and she had "good mobility of all extremities." *See id.*

At a follow up visit with Dr. Rosenfeld on March 19, 2015, Plaintiff reported that the prescriptions were working and she was no longer in pain. *See id.* at 307-08. On July 7, 2016, Dr. Rosenfeld's office noted that Plaintiff was feeling well and her reflux was under control. *See id.* at 531-32.

### 3. Shoulder Pain

On May 22, 2014, Plaintiff visited the ER for several injuries following an assault, including trauma to her chest and left shoulder. *See id.* at 260-63. Imaging revealed no acute fracture or dislocation of the shoulder, and no injury to the chest. *See id.* at 263. By February 13, 2015, Plaintiff had full range of motion of her elbows, wrists, and both shoulders. *See id.* at 294.

In December 2015, Dr. Sommer found that Plaintiff had decreased internal rotation in her right shoulder. *See id.* at 465. On March 14, 2016, Plaintiff complained of tingling and burning in her arms, particularly in her right arm, and "a lot of shoulder pain . . . with decreased [range of motion]." *See id.* at 487. Dr. Sommer prescribed Plaintiff a low dose of prednisone, noting that it had worked well for her symptoms in the past. *See id.* X-rays taken in April 2016 revealed "some mild degenerative change" in the joints, greater on the left than the right, with some "very minor osteophytosis" in the left shoulder joint. *See id.* at 481. Dr. Sommer referred Plaintiff to a pain management specialist to help with these issues. *See id.* at 478.

On July 26, 2016, a new MRI showed "significant degenerative change" and "active arthropathy" at the AC joint. *See id.* at 548. Plaintiff complained of chronic shoulder and neck pain at her administrative hearing on September 6, 2016. *See id.* at 45.

### 4. *Knee Pain*

Plaintiff sustained a knee injury in November 2013 from an ATV accident that was healed by December 20, 2013. *See id.* at 297, 299.

In January 2015, Plaintiff complained of pain in her right knee at her annual physical. *See id.* at 378. Images of Plaintiff's right knee taken on February 9, 2015 did not reveal a fracture or dislocation but showed signs of what was possibly an old avulsion fracture or soft tissue calcification and some degenerative changes. *See id.* at 256. On February 13, 2015, Plaintiff saw N.P. Furlong at Rome Medical Practice for her knee pain. *See id.* at 293. An examination indicated that Plaintiff had pain with full extension of her knee and flexion beyond 90 degrees, but the knee was stable with a "negative anterior posterior drawer sign," no effusion, and no warmth or redness around the knee, and that Plaintiff could ambulate without difficulty. *See id.* at 293-94. N.P. Furlong prescribed physical therapy and anti-inflammatory medication. *See id.*

### 5. *Mental Health*

Plaintiff denied having any psychosocial disorders in August 2012. *See id.* at 248. However, on May 22, 2014, Plaintiff reported mild depression to the ER. *See id.* at 260. On August 3, 2014, Plaintiff was admitted into the ER for an intentional drug overdose, although the severity of this incident was "mild." *See id.* at 264.

Plaintiff suffers from anxiety, which she treats with Venlafaxine, Xanax, or Zoloft. *See id.* at 338, 380, 551. In January 2015, Dr. Sommer reported that he believed Plaintiff's medical symptoms were "exacerbated by her anxiety which I would classify as PTSD." *See id.* at 380. In

February 2015, N.P. Furlong noted that Plaintiff was "an anxious female . . . in no acute distress." *See id.* at 293. On March 6, 2015, state agency psychological consultant Dr. M. Totin found that there was insufficient evidence to substantiate the presence of a mental disorder because Plaintiff had not provided him with enough information about her issues. *See id.* at 73.

In March and July 2015, Plaintiff had two checkups with Dr. Sommer for her anxiety. *See id.* at 338. By July, Plaintiff was starting to "feel much better from an anxiety/depression standpoint," and reported having "good friends as well who are helpful." *See id.* at 325. Dr. Sommer noted that Plaintiff had seen a clinical social worker three or four times who was "a little helpful" and Plaintiff's anxiety was "much improved since last visit." *See id.* at 326. However, Plaintiff was unable to hold a job, "due to constant vomiting and muscle pain." *See id.* at 325. Plaintiff also reported anxiety and depression to Dr. Buckley in August 2015. *See id.* at 322.

In March 2016, Plaintiff told Dr. Sommer that she has obsessive compulsive disorder ("OCD"). *See id.* at 487. This is the first and only mention of OCD in her medical records.

### 6. Substance Abuse

Plaintiff's medical records show that she has a history of substance abuse. *See id.* at 21. Although Plaintiff denied any alcohol or illicit drug use in August 2012, on January 23, 2015, Plaintiff reported at her yearly physical that she is an ex-addict who "abused crystal meth and opiates" in the past. *See id.* at 248, 406, 409. Plaintiff uses alcohol occasionally and marijuana sporadically, and tested positive for cannabis in March 2015. *See id.* at 303, 322, 331, 338, 443.

### 7. Other Medical History

Finally, Plaintiff's medical records include reports from several hospital visits and about medical conditions that are not relevant to her SSI and DBI application. *See id.* at 257-59 (reporting a visit to the ER on January 24, 2014 after a fall); *id.* at 267-72 (reporting three trips to

the ER in 2014 after Plaintiff was assaulted multiple times by her boyfriend); *id.* at 327-34 (reporting an ER visit in May 2015 for a laceration after a four-wheeler accident); *id.* at 409-10 (reporting a visit to a urologist in March 2015 for frequent urinary tract infections and pyelonephritis); *id.* at 418, 428 (reporting ovarian cysts); *id.* at 464 (self-reporting Raynaud's syndrome to a rheumatologist); *id.* at 479 (reporting vomiting, diarrhea and abdominal pain after taking an antibiotic); *id.* at 504-18 (reporting an ER visit after being bitten by a dog).

**B.      Plaintiff's Non-Medical History**

Plaintiff was 37 years old when she began this application. *See id.* at 70. Plaintiff has received almost four years of college education, where she studied criminal justice and paralegal certification. *See id.* at 67, 210. Plaintiff alleges that her disability began on July 1, 2012, and she has not engaged in substantial gainful activity since that date. *See id.* at 20. Prior to her disability, Plaintiff worked as a waitress, secretary, and cleaner. *See id.* at 30, 41-42, 198, 211.

In a function report from May 2014, Plaintiff reported that she throws up daily, has difficulty sleeping, and has trouble with personal care, cooking, climbing stairs, doing laundry, kneeling and squatting, focusing, finishing what she starts, remembering things, and handling stress. *See id.* at 188-95. Still, Plaintiff stated that she can pay bills, count change, and handle a savings account. *See id.* Additionally, Plaintiff socializes with her roommate, visits neighbors, does not need reminders to take medication or care for herself, and tries to get out of the house every day. *See id.* Plaintiff reported that she can stand and walk for an hour on a good day, she does not have any problems sitting if she changes positions every few hours, and she can follow written and spoken instructions. *See id.*

**C.** **Disability Application**

On January 22, 2015, Plaintiff filed a Title II application for a period of disability and DIB, and a Title XVI application for SSI. *See id.* at 18. In her application, Plaintiff alleged degenerative disc disease of her cervical spine, multilevel disc bulging, narrowing of the spinal canal at the C5-C6 and C6-C7 levels, anxiety and depression, disc desiccation mostly in the C5-C6 and C4-C5 levels, marginal and uncovertebral hypertrophy from the C5-C7 levels, joint pain in her legs and feet, Raynaud's disease, neuropathy, and inflammation of the esophagus, stomach and colon. *See id.* at 70. Plaintiff's claims were initially denied on March 6, 2015 after she failed to return the function report and work history forms. *See id.* at 73. Plaintiff filed a written request for a hearing on April 14, 2015. *See id.* at 94-95.

In support of her application, Plaintiff submitted a Medical Source Statement from Dr. Sommer on September 14, 2015 ("2015 Statement"). *See id.* at 315-16. The 2015 Statement is a form with "check marks" expressing Dr. Sommer's findings and recommendations. *See id.* The 2015 Statement indicated that Plaintiff can sit in an upright position in a straight back chair for less than four hours a day, lift only five pounds or less, and stand and/or walk for less than four hours a day without assistance. *See id.* It also specified that Plaintiff can never climb, balance, kneel, crouch, crawl, or stoop, and can only occasionally conduct "reaching in all directions" (including overhead), "handling" (gross manipulation), and "fingering" (fine manipulation). *See id.* The 2015 Statement was originally submitted without the final signature page, so Dr. Sommer resubmitted a complete version on July 24, 2016. *See id.* at 315-16, 470-73. The final page indicated that Plaintiff suffered from a degenerative condition, that she was "worse than previous exam," and that there was "worsening neural [. . .] narrowing." *See id.* at 473.

On September 6, 2016, the SSA held a video hearing before ALJ Julia D. Gibbs. *See id.* at 37-69. The hearing covered Plaintiff's work history, medical history, family, pain level, and

mental health issues. *See id.* at 41-60, 63-65. When asked why she was disabled, Plaintiff

testified that she cannot hold her hands out in front of her or type on a keyboard for more than a

minute or two without experiencing a burning sensation. *See id.* at 45, 58-59. Plaintiff also

discussed problems she was having with her shoulders. *See id.* At the hearing, a vocational

expert testified that there are some jobs that an individual with Plaintiff's limitations can do, such

as "ticket taker," "office helper," and "laminator." *See id.* at 66-67. Additionally, the expert

testified that if such a person could not reach in any direction more than occasionally, that person

could still perform the work of a laminator. *See id.* at 67. The ALJ requested a doctor's opinion

about Plaintiff's "reaching" ability. *See id.* at 61-63. Thus, on September 16, 2016, Dr. Sommer

submitted a supplemental Medical Source Statement ("2016 Statement"), which stated that "[t]he

degenerative disease of Ms. Pruett's neck and shoulders is permanent and likely progressive." *See

id.* at 555-56. The 2016 Statement also said that Plaintiff could work on a computer, but "a lot of

paper-work/shuffling might be limiting." *See id.* at 556.

On March 1, 2017, the ALJ held that Plaintiff was not disabled. *See id.* at 32. Plaintiff

appealed to the SSA Appeals Council, who denied Plaintiff's request for review on November 3,

2017. *See id.* at 1.

## D.      Procedural History

On January 5, 2018, Plaintiff filed a complaint against the Social Security Commissioner

(the "Commissioner") and on October 5, 2018 Plaintiff submitted a motion in support of her

appeal. *See* Dkt. Nos. 1, 15. Plaintiff does not make any legal arguments in her motion, but

simply restates her medical impairments, reviews her work history, and attaches several medical

records. *See* Dkt. Nos. 15, 15-1. While most of these records were included in Plaintiff's

application to the SSA, Plaintiff also attached a new report from an MRI of her knee taken on

March 13, 2017.  *See* Dkt. No. 15-1 at 1-2.  The new images show small joint effusion, a meniscus tear with degenerative change, and a small cyst on the tibia.  *See id.*  Additionally, the report indicates that Plaintiff has right knee pain several times a year, swelling, instability, and difficulty bearing weight.  *See id.*  The MRI did not reveal any tears of the ACL, PCL, or collateral ligament.  *See id.*

On December 10, 2018, the Commissioner filed its response.  *See* Dkt. No. 19.  For the following reasons, Plaintiff's appeal is denied.

## III. DISCUSSION

### A.  The ALJ's Decision

For purposes of both DIB and SSI, a person is disabled when she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do."  The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)).

At step one of the sequential evaluation, the ALJ found that Plaintiff has not engaged in substantial gainful activity since July 1, 2012, the date she applied for SSI.  *See* R. at 20.  Moving

to step two, the ALJ found that Plaintiff has severe impairments, specifically: degenerative disc disease of the cervical spine, chronic low back pain, degenerative joint disease of the shoulders, right rotator cuff impingement, and fibromyalgia. *See id.* at 21. At the same time, the ALJ found that Raynaud's disease, substance abuse, gastrointestinal issues, knee pain, and other impairments have not persisted at a severe level for a continuous 12-month period. *See id.* at 21, 28. As for Plaintiff's depression, anxiety, and post-traumatic stress disorder ("PTSD"), the ALJ considered the four broad areas of mental functioning set out in Appendix 1 of Subpart P of the Disability Regulations ("Appendix 1") and concluded that these impairments are nonsevere because they only mildly limit her ability to function in a work setting.[1] *See id.* at 22-23.

Continuing to step three, the ALJ found that Plaintiff's impairments did not meet the severity of the listed impairments in Appendix 1.[2] *See id.* at 23. The ALJ considered the requirements under Section 1.00 for finding a musculoskeletal system disability (which includes major dysfunction of a joint(s) and disorders of the spine), Section 11.00 for finding a neurological disability, Section 12.04 for finding a disability due to depression, bipolar, and related disorders, and Section 12.06 for finding a disability due to anxiety and obsessive-compulsive disorder. *See id.* Additionally, the ALJ followed Social Security Ruling 12-2p to evaluate Plaintiff's fibromyalgia claim. *See id.* Examining Plaintiff's medical record under these

---

[1] The four broad areas of functioning, known as the "Paragraph B criteria," are: (1) understanding, remembering and applying information, (2) interacting with others; (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. *See* R. at 22-23; 20 C.F.R. § 404, Subpt. P, App. 1.

[2] If a person's impairment meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment, then that person is disabled regardless of their age, education, and work experience. 20 C.F.R. § 404.1520(d). If the impairment is not equivalent to those listed in Appendix 1, the SSA makes a finding about that person's "residual functional capacity" based on the case record to determine if that person can do their past relevant work or if they can "adjust to other work." 20 C.F.R. § 404.1520(e).

regulations, the ALJ concluded that Plaintiff's conditions were not severe enough to equal an impairment from Appendix 1. *See id.*

Next, the ALJ concluded that Plaintiff "has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)," provided the work "does not require rapid rotation of the neck or overhead work." *See id.* at 24. "Such work can be performed either sitting or standing, and thus allows a worker to alternate between those positions every 30 minutes without stopping work or leaving a worksite." *See id.* In reaching this conclusion, the ALJ assessed Plaintiff's statements about her pain and found them to be unreliable. *See id.* at 24-25. Although Plaintiff's impairments could reasonably be expected to produce her pain or symptoms, the record did not support Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms. *See id.* Rather, the medical records showed that Plaintiff received only conservative care for her impairments, and the adopted residual functional capacity accommodated her limitations. *See id.* at 25.

Likewise, the ALJ gave little weight to the Medical Source Statements. The 2015 Statement was incomplete, unsigned, and contained "primarily . . . checked-off responses without any detailed medical evidence." *See id.* at 29. For example, the ALJ noted that although Dr. Sommer wrote that an MRI showed worsening degenerative spondylosis and neural foraminal narrowing, he did not provide the date of that MRI, and Plaintiff's treatment records "do not show that she received more than conservative care for her [spinal issues] . . ., or that her limitations resulting from those problems would reasonably preclude work within the residual functional capacity adopted here." *See id.* at 29-30. The ALJ found the 2016 Statement unpersuasive because it was not accompanied by medical evidence or the result of a functional capacity evaluation. *See id.* at 30. Similarly, the ALJ did not give great weight to the March 2015 opinion

of the state psychological consultant M. Totin because the medical records show that Plaintiff

received routine care for her mental health impairments. *See id.*

At the same time, the ALJ found that Plaintiff's medical records did support a limitation

on working overhead. *See id.* Considering this limitation, the ALJ found that "the residual

functional capacity accommodates [Plaintiff's] impairments by providing for work at a light level

of exertion that does not require rapid rotation of the neck or overhead work," and "can be

performed either sitting or standing, and thus allows a worker to alternate between those positions

every 30 minutes . . . ." *See id.* at 24, 30.

At step four, the ALJ concluded that Plaintiff cannot do any of her past relevant work

because the demands of her prior jobs exceed her residual functional capacity. *See id.* at 30-31.

However, the ALJ noted that the transferability of job skills is not material in Plaintiff's case

because the record shows that Plaintiff can do unskilled, light work. *See* 20 C.F.R. § 404, Subpt.

P, App. 2 (stating that although the SSA should consider the transferability of a person's job skills

in certain cases where a person's past work is skilled or semiskilled, the SSA may find that a

person is "not disabled" if that person can do unskilled work). Since Plaintiff has certain

limitations that impede her ability to perform the full range of light work, at step five the ALJ

asked a vocational expert to opine on whether jobs exist in the national economy for someone

with Plaintiff's limitations. *See* R. at 31. The vocational expert testified that such jobs do exist,

which include ticket taker, office helper, and laminator. *See id.* Based on this testimony and

considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ

concluded that Plaintiff could successfully adjust to other work that exists in significant numbers

in the national economy. *See id.* at 31-32. Accordingly, the ALJ held that Plaintiff is not disabled

and denied Plaintiff's request for SSI. *See id.* at 32.

15

**B.      Analysis**

### *1.  Standard of Review*

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does

not determine *de novo* whether a plaintiff is disabled.  *See* 42 U.S.C. §§ 405(g), 1383(c)(3);

*Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Court

must examine the Administrative Transcript to ascertain whether the correct legal standards were

applied, and whether the decision is supported by substantial evidence.  *See Shaw v. Chater*, 221

F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  "Substantial

evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).  If supported by

substantial evidence, the Commissioner's finding must be sustained "even where substantial

evidence may support the plaintiff's position and despite that the court's independent analysis of

the evidence may differ from the [Commissioner's]."  *Rosado v. Sullivan*, 805 F. Supp. 147, 153

(S.D.N.Y. 1992) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)) (other citations

omitted).  In other words, this Court must afford the Commissioner's determination considerable

deference, and may not substitute "its own judgment for that of the [Commissioner], even if it

might justifiably have reached a different result upon a de novo review."  *Valente v. Sec'y of

Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### *2.  The ALJ Properly Assigned Little Weight to Plaintiff's Statements*

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an

independent judgment, in light of medical findings and other evidence, regarding the true extent

of the pain alleged by the claimant."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  The

regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. . . .  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] makes to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quotations and citations omitted).

If a plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors, including the following: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; and (6) other measures taken to relieve symptoms.  20 C.F.R. § 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether the plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence.  *See* SSR 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, *2 (Soc. Sec. Admin. Oct. 25, 2017).  One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the record.  *Id.* at *5.

"After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony." *Saxon v. Astrue*, 781 F. Supp. 2d 92, 105 (N.D.N.Y. 2011) (citing, *inter alia*, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)).  An ALJ rejecting subjective testimony "'must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.'"  *Melchior v. Apfel*, 15 F. Supp. 2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).

Here, the ALJ identified Plaintiff's severe impairments and concluded that these impairments could reasonably be expected to cause the symptoms that she alleges.  *See* R. at 21, 24; *Genier*, 606 F.3d at 49.  However, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the other evidence in the record.  *See* R. at 24-25.  The ALJ properly considered the Section 416.929(c)(3)(i)-(vi) factors to reach this conclusion.  The ALJ compared Plaintiff's medical records to the statements she made in her disability report, brief to the SSA, and testimony before the ALJ.  *See id.*  The ALJ found that Plaintiff received no more than conservative care for the degenerative disc disease of her cervical spine, joint disease in her shoulders, right shoulder impingement, lower back pain, and fibromyalgia, and concluded that none of these issues persisted at a level of severity that would reasonably preclude work within the residual functional capacity.  *See id.*  Plaintiff's own statements support this finding.  *See id.* at 188-95 (claiming that she can stand or walk for about an hour on a good day, sitting is "not really a problem," and she cannot turn her neck "too far").  Thus, the ALJ properly determined that Plaintiff's complaints about the severity of her pain were not credible.  *See* SSR 16-3p, 2017 WL 5180304, *2.

### 3. *The ALJ Properly Assigned Little Weight to the Medical Source Statements*

The treating physician rule states that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). When an ALJ refuses to assign a treating physician's opinion controlling weight, a number of factors must be considered to determine the appropriate weight to assign, including: (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c). After accounting for these factors, "the ALJ must 'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (internal quotation marks and citation omitted). "Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.* at 129-30 (internal quotation marks and citation omitted).

The ALJ comprehensively set forth her reasons for the little weight she assigned to Dr. Sommer's Medical Source Statements. As the ALJ noted, the Medical Source Statements were not based on an examination, were supported by little evidence, and were inconsistent with the record. *See* 20 C.F.R. § 404.1527(c). The original 2015 Statement was incomplete, unsigned, and contained merely "checked-off responses without any detailed medical evidence." *See* R. at 29. Likewise, the 2016 Statement's conclusions that Plaintiff had very limited reaching abilities was not accompanied by detailed medical evidence and not the result of a functional capacity

evaluation. *See id.* at 30, 556. Finally, the ALJ reasoned that the Medical Source Statements were contradicted by substantial evidence in Plaintiff's medical records, as the medical records suggest that Plaintiff's back pain has been under control, and her issues are not severely progressing. *See id.* at 25 (noting that Plaintiff never received a spinal block or spinal fusion); *id.* at 25, 29-30 (citing records that found "no intensity change in the claimant's spinal cord," and in which Plaintiff "denied any numbness or weakness in her hands"); *id.* at 26 (citing an MRI that showed some slightly worsened issues but found Plaintiff's lumbar spine to be unremarkable); *id.* at 26-27 (discussing how Plaintiff informed Dr. Sommer that she was working in her garden); *id.* at 26 (discussing an MRI that showed little change in Plaintiff's cervical spine since April 2015). Since the Medical Source Statements contradict all the other evidence in the record, the decision to assign little weight to the Medical Source Statements was not improper.

### 4. The Decision Applied the Correct Legal Standards and is Supported by Substantial Evidence

Upon reviewing the ALJ's decision, the Court finds that the ALJ applied the correct legal standards and the ALJ's determination is supported by substantial evidence. *See Shaw*, 221 F.3d at 131. As such, the Commissioner's finding of not disabled must be sustained. *See Rosado*, 805 F. Supp. at 153.

First, Plaintiff's work history supports the ALJ's determination that Plaintiff has not engaged in substantial gainful work activity since she applied for disability. *See* R. at 30, 41-42, 198, 211. Next, the record supports the ALJ's conclusion that Plaintiff had severe impairments, specifically: degenerative disc disease of the cervical spine, chronic low back pain, degenerative joint disease of the shoulders, right rotator cuff impingement, and fibromyalgia. *See id.* at 21. Severe impairments are those impairments which cause more than minimal functional limitations

and persist for a continuous period of at least twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521, 416.920(a)(4)(ii), and 416.921. The extensive medical records, including images of Plaintiff's spine from March 2013, January 2014, February 2015, April 2015, and February 2016, support the ALJ's conclusion that these impairments were severe. *See* R. at 252-53, 255, 295, 335, 430-31.

At the same time, the ALJ properly concluded that these impairments do not rise to the severity of the impairments listed in Appendix 1, which render a person disabled *per se*, regardless of their age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Section 1.00 of Appendix 1 defines a musculoskeletal system impairment as something that causes an extreme limitation on the ability to walk, which prevents individuals from carrying out activities of daily living. 20 C.F.R. § 404, Subpt. P, App. 1 at 1.00(B)(2). Similarly, Section 11.00 defines neurological impairment as something that causes an extreme limitation on a person's ability to stand up from a seated position, balance while walking or standing, or use their upper extremities. *Id.* at 11.00(D)(2). Plaintiff's ailments have not extremely limited her in this way, as she received only "conservative care for her chronic low back pain," was able to treat her symptoms with physical therapy and anti-inflammatory medication, and possibly visited a chiropractor and pain management specialist. *See* R. at 25, 263-64, 321, 323. Although Plaintiff told the ALJ that she used a wheelchair or crutches in the past, none of her medical records indicate that Plaintiff ever required an assistive device to walk. *See id.* at 27. Plaintiff even reported to Dr. Sommer that she was able to work in her garden. *See id.* at 325. As such, her physical conditions are not as severe as the impairments listed in Appendix 1.

Additionally, the Court finds that the ALJ properly evaluated Plaintiff's mental impairments under Paragraph B criteria and determined that Plaintiff had only a mild limitation in

each of these areas. *See id.* at 22-23. The Paragraph B criteria evaluate how a person's mental disorder limits their functioning in a work setting by considering an individual's ability to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *See* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00(E). Plaintiff has no more than a mild limitation on her ability to understand, remember, or apply information, as she had obtained a driver's license in the past and reported that she could handle money. *See* R. at 191. As to the second element, Plaintiff does not have a problem getting along with others, spends time her roommate daily and her neighbor about once a week, and has good friends who are "helpful." *See id.* at 192, 325. Regarding the third consideration, Plaintiff can pay bills, count change, and handle a savings account. *See id.* at 191. Additionally, she has been successfully treating her anxiety, which exacerbates her other issues. *See id.* at 325, 380, 551. Finally, Plaintiff lives with a roommate, can feed herself, sit, use her hands, and do laundry on a good day, so the record indicates no more than a mild limitation on her ability to adapt or manage herself. *See id.* at 189-93. Thus, the record supports the ALJ's conclusions that Plaintiff's mental impairments are not severe.

The record also supports the ALJ's conclusion that Plaintiff's other impairments did not persist at a severe level for a continuous 12-month period. *See id.* at 305-08, 531-32 (indicating that Plaintiff's gastrointestinal issues were under control by March 2015 and on July 7, 2016 Plaintiff was no longer in pain); *id.* at 256, 297-99 (reporting a knee injury from November 2013 that was healed by December 2013); *id.* at 257-59, 267-72, 327-34, 479-80, 504-23 (recording several isolated visits to the hospital for physical assaults, a four-wheeler accident, a reaction to an antibiotic, and dog bite from which Plaintiff recovered).

Next, the ALJ properly found that Plaintiff has a residual functional capacity to perform light work. The residual functional capacity is based on "all of the relevant medical and other evidence" including "statements about what [the applicant] can still do that have been provided by medical sources," and "descriptions and observations" about the applicant's limitations from the impairments and symptoms (such as pain) provided by the applicant, her family, neighbors, friends, or other persons. 20 C.F.R. § 404.1545(a)(3). The ALJ reviewed Plaintiff's medical history of degenerative disc disease of the cervical spine, degenerative joint disease of the shoulders, right shoulder impingement, chronic low back pain, and fibromyalgia, and concluded that with these impairments, Plaintiff could perform work that demands a light level of exertion and does not require rapid rotation of the neck or overhead work. *See* R. at 25. This conclusion is supported by Plaintiff's medical records, which show that pain medications were helping with her neck, back, and shoulder pain, *see id.* at 244-49, 338, 378-80, 487 (discussing treatments that alleviate plaintiff's pain), and Plaintiff's own statements to her doctors, *see id.* at 297, 325 (denying weakness in hands or dropping objects and informing Dr. Sommer that she was working in her garden despite her pain).

Finally, the ALJ's determination that Plaintiff cannot do her past relevant work but other work exists in significant numbers in the national economy that accommodates Plaintiff's residual functional capacity is supported by substantial evidence. The ALJ properly reviewed Plaintiff's residual functional capacity in conjunction with the Medical-Vocational Guidelines. *See id.* at 31-32; 20 C.F.R. § 404, Subpt. P, App. P. The ALJ also considered testimony from a vocational expert, who based his testimony on his experience as a job developer, published research on "sit/stand jobs," the Department of Labor and Employment Quarterly, and the Dictionary of Occupational Titles. *See id.* at 31-32, 68-69. In fact, the ALJ specifically noted that the jobs

offered by the vocational expert could "be performed either sitting or standing," which allow

Plaintiff to "alternate between those positions every 30 minutes without stopping work . . . ." *See id.* at 24. Therefore, the ALJ's conclusion that jobs existed that she could perform is supported by substantial evidence in the record.

Accordingly, the Court finds that the ALJ applied the correct law to determine that Plaintiff was not disabled and that her decision is supported by substantial evidence.

### 5. *New Evidence*

Upon judicial review of a denial of social security benefits, a district court may remand a case to the Commissioner to consider additional evidence that was not included as part of the original administrative proceedings. *See* 42 U.S.C. § 405(g) (sentence six) ("The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ."). This type of remand, commonly referred to as a "sentence six remand," is only appropriate if a plaintiff can show that the evidence is (1) new and not cumulative of what is already in the record; (2) material in that it is relevant to the claimant's condition during the time period for which benefits were denied and there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the disability determination differently; and (3) good cause has been shown for failing to present the evidence earlier. *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991); *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).

Plaintiff has submitted a report from a new MRI of her right knee that was taken on March 13, 2017, and asks the Court to excuse her lack of organization because "it's been so very difficult, due to anxiety, to complete this in a more organized matter." *See* Dkt. No. 15 at 3; Dkt.

No. 15-1 at 2. The Commissioner responds that the Court should not consider this new evidence because Plaintiff has not shown good cause for failing to present the evidence earlier and because she has not established a "reasonable possibility that the new evidence would have influenced the Commissioner to decide the disability determination differently." *See* Dkt. No. 19 at 26-28.

The Court agrees with the Commissioner and finds that Plaintiff has not provided good cause for failing to present this evidence to the SSA Appeals Council. "To show good cause, [the plaintiff] must adequately explain her failure to incorporate the proffered evidence into the administrative record." *Lisa*, 940 F.2d at 45. Although the new MRI occurred twelve days after the ALJ issued her decision on March 1, 2017, the SSA Appeals Council did not deny Plaintiff's request for review until November 3, 2017. *See* R. at 1. Plaintiff could have submitted this new MRI to the SSA Appeals Council for review but cites her anxiety as the reason she did not do so. However, the medical records show that Plaintiff's anxiety was successfully being treated by medication, and the ALJ concluded that her anxiety did not severely impair Plaintiff's ability to function. *See id.* at 325-26, 338, 380, 551. Since this new MRI existed before the SSA Appeals Council made its decision, Plaintiff has not established good cause for failing to present it until now.

Even if Plaintiff had good cause, she has not shown that the new MRI is "material in that it is relevant to the claimant's condition during the time period for which benefits were denied and there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the disability determination differently." *See Lisa*, 940 F.2d at 43. Unlike in cases that are remanded pursuant to sentence six, the new MRI does not reveal an impairment that is substantially more severe than anything previously diagnosed. *See id.* at 44 (remanding to the Commissioner for consideration of new medical reports that contained a new diagnosis and "shed

considerable new light on the seriousness of [the claimant's] condition"); *Teneyck v. Colvin*, No. 1:12-CV-0308, 2014 WL 975597, *7-8 (N.D.N.Y. Mar. 12, 2014) (remanding for consideration of a new medical report that found psychiatric and cognitive problems and "several serious compulsions" where an ALJ had found that Plaintiff's statements about these issues were not credible).  Before reaching a determination, the ALJ reviewed Plaintiff's medical records, which included several visits to the doctor for knee pain, and concluded that Plaintiff did not have a severe impairment of the knee.  *See* R. at 21.  The new MRI shows small joint effusion (a.k.a. swelling), a meniscus tear with degenerative change (usually resolved by physical therapy and rest), and a small cyst on the tibia, but did not reveal any tears of the ACL, PCL, or collateral ligament.  *See* Dkt. No. 15-1 at 1-2.  None of these issues are substantially more severe than anything previously diagnosed.  Therefore, the Court finds that this new MRI would not have changed the Commissioner's decision about Plaintiff's disability determination.

"[C]laimants ordinarily should have but one opportunity to prove entitlement to benefits, otherwise disability administrative proceedings would be an unending merry-go-round with no finality to administrative and judicial determinations." *Tirado*, 842 F.2d at 596.  Plaintiff has not provided good cause for failing to present the new MRI earlier, and has not shown that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide differently.  Accordingly, the Court holds that the new MRI does not require remand.

### IV. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that the Commissioner's decision denying disability insurance benefits and supplemental security income is **AFFIRMED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in the Commissioner's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 25, 2019
Albany, New York

Mae A. D'Agostino
U.S. District Judge